Case No.: 12-55220

# UNITED STATES COURT OF APPEAL

# FOR THE NINTH CIRCUIT

ROBERT M. SWEENEY,                )
                                  )
      Plaintiff/Appellant,       )
  vs.                            )     USDC CASE NO. 2:11-CV-05098- GW
                                  )
MASTR ADJUSTABLE RATE             )
MORTGAGES TRUST 2007-1, MORTGAGE  )
PASS-THROUGH 2007-1; U.S. BANK    )
NATIONAL ASSOCIATION; AMERICAN    )
HOME MORTGAGE SERVICES INC.; POWER)
DEFAULT SERVICES, INC., a Delaware)
corporation; FIDELITY NATIONAL TITLE, an )
unknown entity; FIDELITY NATIONAL )
DEFAULT SERVICES, an unknown entity; )
DEFAULT RESOLUTION NETWORK, an    )
unknown entity                    )
                                  )
      Defendants/Respondents     )
_____ )

APPEAL FROM ORDER DISMISSING SECOND AMENDED
COMPLAINT AND GRANTING JUDGMENT
Hon. George H. Wu, District Judge
-------------------------------------------------------------------------

# APPELLANT'S REPLY BRIEF

JOHN F. SHELLABARGER (SBN # 132805)      RICHARD I. WIDEMAN (SBN # 41185)
928 Garden Street, Suite 3               3640 Sagunto Street #208
Santa Barbara, CA 93101                  P. O. Box 1921
Telephone: (805) 962-4150                Santa Ynez, CA 93460-1921
Facsimile: (805) 963-0161                Telephone: (805) 245-8916 Fax (805) 688-9424
                                         E-mail: riwlaw@gmail.com

Attorneys for Appellant/Plaintiff Robert M. Sweeney

*SWEENEY vs. AMERICAN HOME MORTGAGE, et al*
Ninth Circuit # 12-55220

## APPELLANT'S OPENING BRIEF

### TABLE OF CONTENTS

INDEX TO CITATIONS………………………………...…………………………………ii

THE SECOND AMENDED COMPLAINT IS SUFFICIENT UNDER
THE *IQBAL-TWOMBLY* TEST……………..……………………………………………1

PLAINTIFF'S CLAIMS OF FORGERY BY RESPONDENTS AHMSI
AND FIDELITY ARE PLAUSIBLE…………………………………………………..2

RECENT CASES HAVE HELD THAT SIMILAR ALLEGATIONS ARE
SUFFICIENT……………………………………………………………………………..4

RESPONDENTS DELIBERATELY MISCONSTRUE THE DISTRICT
COURT'S COMMENTS AND THE PLEADING STANDARD;
THE SAC WAS WELL-PLEADED…………………………………………………...5

CONCLUSION……………………………………………………………………9

REQUEST FOR JUDICIAL NOTICE …………………………………………………10

Reuters, "Special Report: Legal woes mount for a foreclosure kingpin" (12/6/2010)….11

U.S. Trustee to Federal Judge: "Fidelity Operated an Affidavit-Execution Process
That Systematically Caused the Execution of False Affidavits"   (2/15/2011)…………17

PROOF OF SERVICE…………………………………………………………………...19

i

<u>INDEX TO CITATIONS</u>

STATUTES:

Fed. Rules Civ. Proc. Rule 9(b)……………………………………………………...6

Civil Code§2920.5 *et seq*. "Homeowners Bill of Rights"...................................................3

Civil Code §2924c(f)………………………………………………………………….. 8


CASES:

<u>Ashcroft v. Iqbal</u> (2009), 556 U.S. 662………………………………………………1, 2

<u>Bell Atlantic v. Twombly</u> (2007), 550 U.S. 544…………………………………………1, 2

<u>Coward v. J.P. Morgan Chase</u> (E.D. Cal., June 15, 2012), 2012 WL 2263359…………...4

<u>Gates Rubber Co. v. Ulman</u> (1989), 214 Cal.App.3d 356………………………………...8

<u>Gomes v. Countrywide Home Loans, Inc.</u> (2011) 192 Cal.App.4th 1149………………...5

<u>In Re Deuel</u> (9th Cir. 2010), 594 F.3d 1073 ……………………..…………………….8

<u>In Re Salazar</u> (S.D. Cal. 2011), 448 B.R. 814……………………………………...…..3

<u>In Re Salazar</u> (S.D. Cal. 2012), 470 B.R. 557…………………………………………3

<u>Lona v. Citibank</u> (2011), 202 Cal.App.4th 89…………………………………………..5

<u>**SWEENEY vs. AMERICAN HOME MORTGAGE, et al**</u>
Ninth Circuit # 12-55220

# APPELLANT'S REPLY BRIEF

## THE SECOND AMENDED COMPLAINT IS SUFFICIENT UNDER THE *IQBAL-TWOMBLY* TEST

Defendants argue that "The District Court correctly concluded that the SAC failed to meet the pleading requirements" set out in two Supreme Court cases: <u>Ashcroft v. Iqbal</u> (2009), 556 US 662, 129 S Ct 1937 and <u>Bell Atlantic v. Twombly</u> (2007), 550 US 544, 127 S Ct 1955. Neither of those cases dealt with a claim of "forgery." [*Twombly* was a "conspiracy" case and *Iqbal* dealt with a dubious "discrimination" claim]. These cases hold that a pleading is sufficient if it relies on facts and not "threadbare recitals" of conclusions that are "not entitled to the assumption of truth." As the Court said in <u>Ashcroft v. Iqbal</u>, 556 US at 663-664:

> "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556, 127 S.Ct. 1955. Two working principles underlie *Twombly*. First, the tenet that a court must accept a complaint's allegations as true is inapplicable to **threadbare recitals of a cause of action's elements, supported by mere conclusory statements**. *Id.,* at 555, 127 S.Ct. 1955. Second, determining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense. *Id.,* at 556, 127 S.Ct. 1955. **A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth**." [Emphasis added].

There were no such "threadbare recitals" or "mere conclusions" of the elements of the cause of action here; facts were pleaded specifically in the SAC. The specific forged document was Exhibit A to the Second Amended Complaint,

and other examples of the same person's signature, some genuine [Ex. B] and some other forgeries [Ex. C] were included in the SAC.  More crucially, the District Court itself here said (twice) that it would make the assumption of "truth" of the "forgery" allegations. [See: Appellant's Opening Brief, page 7 for quotes from the District Court at the hearing on November 21, 2011], obviously meeting the "assumption of truth" prong of what Respondents call the "_Iqbal-Twombley_ rule."  Plaintiff's SAC here met the "facial plausibility" standards of _Iqbal_ and _Twombly_; the rule set out in those cases compels reversal of the dismissal here.

Plaintiff also asks the Court to note that nowhere in Respondent's Brief do the Respondents challenge the cases or the rule that a forged document is **void**.

## PLAINTIFF'S CLAIMS OF FORGERY BY AHMSI AND FIDELITY (DEFENDANTS HERE) ARE "PLAUSIBLE"

In what is the height of sophistry and in an attempt to deliberately mislead this Court and the District Court, AHMSI and its cohort in this case, Fidelity, which are the subjects of at least one criminal investigation concerning their rampant use of forged documents to justify foreclosures, claim here that the assertion that they would base a foreclosure on a forgery is "implausible."  That position is virtually unbelievable and borders on the frivolous.  Given the depths to which financial institutions' greed has driven the economy in this county and throughout the world, what is implausible is that anyone (let alone a District Court as a matter of law at a pleading stage) would find that any financial institutions and these defendants in particular are above acting wrongfully (even illegally) for their financial benefit, without regard to the consequences.

Without any evidence from Defendants and despite the allegation in par. 12 of the SAC that this was "the normal and usual course of business by defendants herein seeking to foreclose...to record…forged and fabricated documents" (full

paragraph 12 of SAC quoted on page 5 of Appellant's Opening Brief), the District Court dismissed the SAC. The District Court's conclusion that the scenario pleaded in the SAC of a foreclosure based on a forged Substitution of Trustee was "implausible" is entirely unsupported factually in the record, is both incorrect and is contrary to the well pleaded facts in the SAC (which must be assumed to be correct – only "bare conclusions" can be disregarded) and to the facts underlying the current economic situation, as well as numerous reports that such conduct by these very defendants was widespread.

The possibility that these very defendants would commit forgeries to allow them to foreclose is real and is currently the subject of various matters in other jurisdictions.  The citation for judicial notice of the "CBS 60 Minutes" program highlighting such forgeries (cited in Appellant's Opening Brief) is http://www.cbsnews.com/video/watch/?id=7361572n.  In addition to that program, this Court is invited to take judicial notice of the following (copies are attached) internet articles dealing with these defendants and improperly signed documents to allow foreclosures:

1. American Home Mortgage Servicing's participation in a "massive signing operation" involving "thousands of documents a day" with Fidelity Default Services, the entity that handled the foreclosure here. See: REUTERS, 12/6/2010.

2. Post-trial Brief by the Bankruptcy Trustee In Re Wilson (USDC, Louisiana) quoted on attached with citations to internet reports. The Trustee there asserted: "Fidelity operated an affidavit-execution process that systematically caused the execution of false affidavits;"

The Court is also invited to note the recently enacted California Homeowners Bill of Rights, [Civil Code§ 2920.5 through 2920.20].  This new law

3

prohibits "Robo-signing" and phony documents.  New Civil Code § 2924.17(b) bars the filing or recording of documents unless the servicer ensures "that it has reviewed competent and reliable evidence to substantiate the borrower's default **and the right to foreclose**, including the borrower's loan information." There would be no need for such a law without abuses such as alleged in the SAC here.

These defendants' use of forged of documents in the chain of title needed to foreclose (like the Substitution of Trustee here) is not "implausible;" the use of such documents was apparently widespread, as alleged in par. 12 of the SAC. The Court here is not required to find that such conduct did or did not take place in order to reverse the District Court's order of dismissal; where there is smoke there is usually fire and the fact that there is a lot of smoke about that kind of conduct compels the Court to reject the District Court's conclusion that such conduct is "implausible."  Dismissal of the SAC without leave to amend here was not proper in the face of the evidentiary material plaintiff provided (Exhibits A, B and C to the SAC) and the factually-based allegation that this practice was "widespread" in par. 12 of the SAC.

## RECENT CASES HAVE HELD THAT SIMILAR ALLEGATIONS ARE SUFFICIENT

In Salazar, (SD Cal 2011), 448 B.R. 814, 816[1] the court, denying relief from stay, said:

> "If U.S. Bank's foreclosure sale was invalid, Salazar has an interest in the Property which militates in favor of continuing the stay. If U.S. Bank was not authorized to foreclose the DOT under Civil Code section 2932.5, the foreclosure sale may be

---

[1] This case was reversed on other grounds at 470 B.R. 557.

void, and Salazar would not need to tender the full amount of the loan to set aside the foreclosure sale."

In <u>Coward v. J.P Morgan Chase</u> (E.D. Cal, June 15, 2012), 2012 WL 2263359, a case of fraud dealing with allegedly forged signatures (of the husband) against the Bank, the Court held the pleading was sufficient. The Court said:

"Plaintiff alleges that Defendant's representatives forged the loan documents, thus committing fraud, to prevent the loan documents underlying the foreclosure from being invalidated." [Slip Opinion, page 3]. The District Court there denied the Motion to Dismiss. The pleading there was much less factually precise than the pleading here.

In <u>Lona v. Citibank</u> (December, 2011), 202 Cal App 4th 89, 113 the California Court of Appeal reversed a lower court's grant of summary judgment in an action to set aside a foreclosure  and held that there are four exceptions to the tender rule including the situation "when the trustor is not required to rely on equity because the Trustee's deed is void on its face" (citing the same cases that are cited in Appellant's Opening Brief here that hold a Trustee's deed by an unauthorized Trustee is void).

See also:  <u>Gomes v. Countrywide Home Loans, Inc.</u> (2011) 192 Cal.App.4th 1149, 1158, "Gomes would have to plead that a trustee initiated the foreclosure proceeding but was not actually the trustee at the time."

## RESPONDENTS DELIBERATELY MISCONSTRUE THE DISTRICT COURT'S COMMENTS AND THE PLEADING STANDARD; THE SAC WAS WELL-PLEADED

Respondents argue that the District Court's "assume the forgery" comments are cited "out of context" [Respondent's Brief, page 25].  Those comments (set out in full in Appellant's Opening Brief at page 7) were not "out of context" at all; the

District Court specifically **ordered** (it used that word) Respondents here to "assume the forgery." That means Respondents were not supposed to raise arguments that forgery was not "sufficiently pleaded" but were to tell the Court why such a forgery would not allow plaintiff to prevail. Notwithstanding that admonition and order, Respondents' position before the District Court and Respondents' Brief here contains nothing more than a litany of arguments that the fraud was not sufficiently pleaded. The position of Respondents here is captured in one sentence; "The bare assertions of Sweeney that there was a forgery without adequately alleging the elements of forgery was found insufficient to state a cause of action." [Respondents' Brief, page 15].

The SAC did not rely on a "bare assertion of forgery." Rule 9(b) Fed. Rules Civ. Proc. provides that fraud must be pleaded with particularity; it does not say that each element of an alleged forgery must be pleaded with particularity (nor does **any case** cited by Respondents so hold). Nonetheless, the specific fact of the forgery of the specific Substitution of Trustee document (Ex. A) is pleaded in the SAC, as well as other documents that support that conclusion that the "Cindi Ellis" signature was forged[2], the claim that this was done intentionally to allow the foreclosure to take place and the fact that is conduct is in furtherance of a practice to use forged documents to allow foreclosures. The SAC alleges that it was necessary to have a forged document to allow the new Trustee (Power Default – a Fidelity company) to conduct the sale, the fact that this was done deliberately as

---

[2] The fact that the actual signer was not "authorized" **mus**t be inferred. See: argument at Appellant's Opening Brief, pages 17 and 20 – that argument was not responded to at all in Respondents' Brief. There is no possible or plausible reason other than to defraud why an "authorized" person would sign someone else's name, not their own. There is no possible valid reason for a notary to acknowledge a false signature ("authorized" or not) to allow the document to be recorded other than to defraud. People commit crimes because they think they can get away with the crime, not usually because they think they are going to get caught.

part of an ongoing plan among the defendants here to execute forged documents to enable foreclosures to take place was alleged (SAC, par 12) and the fact that plaintiff lost his home as a result of the forged Substitution due to the sale conducted by the improper Trustee (a void sale) was also pleaded. Those allegations satisfy any obligation to plead the elements of forgery, if such an obligation exists.

At the very least, that level of factual pleading cannot justify the refusal to grant leave to amend.

Respondents assert that the only conclusion that can be derived from the facts alleged in the SAC (at least they admit there are facts alleged) is that "the only party that would be damaged by such a scam would be U.S. Bank National Association itself" (Respondents' Brief, page 17) and (at Respondent's Brief, page 20) that, "a party (Appellee U.S. Bank National Association) perpetrated a fraud upon itself." That position is patently absurd; it is devoid of any logical or legal basis and is entirely unsupported by any case law or any fact. That is not what was pleaded. That the District Court accepted that argument is error and compels reversal.

U.S. Bank was not "defrauding itself;" there is no such claim in the SAC. The forged Ex. A Substitution of Trustee allowed an entity that was not a proper trustee (Fidelity's subsidiary, Power Default) to conduct a Trustee's sale of Mr. Sweeney's real property and to deliver what purports to be title to that property to U.S. Bank. Without that sale, Mr. Sweeney, and not U.S. Bank, would be the record owner of the real property. It is Mr. Sweeney who lost his home; U.S. Bank lost nothing[3]. Until the void foreclosure sale, Mr. Sweeney was the legal and

---

[3] Query: What did U.S. Bank lose? Without the foreclosure, it still would have a trust deed of record as security for the loan, would still owed money by Mr.

equitable owner of the property; after the sale (by the improperly appointed Trustee, Power Default), U.S. Bank had obtained legal title to the property. U.S. Bank did not pay anyone $1,085,450 (as Respondents assert at page 17 of their Brief without any evidence); it simply "bid in" an amount so it could get the title from Mr. Sweeney and foreclose his interest in the property at the void sale. If it had, in fact, paid money for the property at the trustee's sale and had not been involved with the note prior to the sale, it would be a "bona fide purchaser" and there would be no defense available to Sweeney as against it. See: E.g., Civil Code §2924c(f); In re Deuel (9th Cir. 2010), 594 F.3d 1073, 1080 cert. denied (U.S. 2010) 131 S. Ct. 85; Gates Rubber Co. v. Ulman (1989), 214 Cal App 3d 356, 364 "The elements of a bona fide purchase are payment of value, in good faith, and without actual or constructive notice of another's rights."

Respondents here have **never claimed** that U.S. Bank was a "bona fide purchaser for value without notice" and, since U.S. Bank, the "purchaser" at the void Trustee's sale, is alleged in the SAC to have been a participant in the forgery scheme – and thus deemed to have had notice of the forged Substitution of Trustee – it cannot claim to be one at this pleading stage.

Respondents pretend to refuse to grasp the allegation in the SAC that, in addition to taking property unlawfully from plaintiff, they were defrauding the entire recording system of California and its entire foreclosure system by conducting a "Trustee's" sale based on a forged document appointing the Trustee.

---

Sweeney and would be in exactly the same position as it was in prior to the void sale. On the other hand, Mr. Sweeney has lost his title to the property and his right to occupy it until a proper foreclosure, regardless of whether or not he is making payments. The Court is urged to remember that Mr. Sweeney did not have anything to do with the forgery or conducting the void sale; it is not his responsibility to see that Defendants exercised their rights properly; that is their **obligatio**n under the private foreclosure rules in California.

Respondents' argument (made repeatedly and apparently accepted by the District Court) that the forgery did not cause Mr. Sweeney's default or cause him to fail to make his payments is a classic "straw man."  It simply does not matter **why** plaintiff did not make payments on the underlying obligation; what matters here is that the Trustee that purported to conduct the foreclosure was not properly authorized to do so and that the foreclosure sale process was **void**.  Mr. Sweeney's lack of payments on the underlying note, his defaults or the fact that he might be able to stay in his house without making payments (a fact which seemed to bother the District Court here) are irrelevant to any issue before the District Court or this Court and should not have been considered by the District Court in deciding whether a claim was well-pleaded in the SAC.

In order to conduct a private foreclosure in California, a trust deed beneficiary need only comply with a few simple rules; following those rules is the responsibility of the trust deed beneficiary and the other Respondents here, and the result of their non-compliance is to have the foreclosure sale set aside as void.

## CONCLUSION

The District Court's Dismissal of Plaintiff's SAC should be reversed and the matter sent back for discovery and trial on the merits.

RICHARD I. WIDEMAN, Esq.
JOHN F. SHELLABARGER, Esq.

s/RICHARD I. WIDEMAN

By:_____
RICHARD I. WIDEMAN, Esq.
Attorneys for Appellant Robert Sweeney

9

# REQUEST FOR JUDICIAL NOTICE

- **Reuters 12/6/2010**
- **Report 2/16/2011 (Neil Garfield)**

*10*



| Home | Business | Markets | World | Politics | Tech | Opinion | Breakingviews | Money | Life | Pictures | Video |

**humans**



electric *orange*-
checking

**TURN ON
THE POWER
OF CHECKING
AND GET A
$50 BONUS**

• More freedom & no fees
• Access to over 35,000
  fee-free ATMs
• CheckMate™ – Make
  deposits from anywhere,
  anytime

Learn More

ING DIRECT

MEMBER FDIC

**Follow Reuters**



Facebook    Twitter    RSS    YouTube

**RECOMMENDED VIDEO**

ARTICLE    COMMENTS (7)

# Special report: Legal woes mount for a foreclosure kingpin

Recommend    12 people recommend this.



By Scot J. Paltrow
JACKSONVILLE, Florida | Mon Dec 6, 2010 2.10pm EST

Tweet 0
Share
Share this
0
Email
Print

**Related Topics**
Money »
Housing Market »

(Reuters) - Lender Processing Services is riding the waves of foreclosures sweeping the United States, but in late October its CEO, Jeff Carbiener, found himself needing to reassure investors in the $2.8 billion company.

Although profits were rolling in, LPS's stock had taken a hit in the wake of revelations that mortgage companies across the country had filed fraudulent documents in foreclosures cases. Earlier in the year, the company, which handles more than half of the nation's foreclosures, had disclosed that it was under federal criminal investigation and admitted that employees at a small subsidiary had falsely signed foreclosure documents.

Still, Carbiener told the Wall Street analysts in an October 29 conference call that LPS's legal concerns were overblown, and the stock has jumped 13 percent since its close the day before the call.

But a Reuters investigation shows that LPS's legal woes are more serious than he let on. Public records reveal that the company's LPS Default Solutions unit produced documents of dubious authenticity in far larger quantities than it has disclosed, and over a much longer timespan.

Questionable signing and notarization practices weren't limited to its subsidiary, called DocX, but occurred in at least one of LPS's own offices, mortgage assignments filed in county recorders' offices show. And rather than halt such practices after the federal investigation got underway, the company shifted the signing to firms with which it has close business ties. LPS provided personnel to work in the new signing operations, according to information from an LPS spokeswoman and court records including an October 21 ruling by a judge in Brooklyn, New York. Records in county recorders' offices, and in the judge's opinion, show that "robosigning" and preparation of apparently false documents went on at these sites on a large scale.

In one instance, it helped set up a massive signing operation at the nearby office of a major client, a spokeswoman for the client, American Home Mortgage Servicing, confirmed. LPS-hired notaries who worked there said in interviews that troves of documents were improperly handled. They said that about 200 affidavits per day were robosigned during the two months the two notaries remained there.

## KEY RATES

MORTGAGE  HOME EQUITY  SAVINGS  AUTO  CREDIT CARDS

See today's average mortgage rates across the country

| TYPE | TODAY | 1 MO |
|------|-------|------|
| 30-Year Fixed | 3.54% | 3.54% |
| 15-Year Fixed | 2.89% | 2.98% |
| 10-Year Fixed | 3.00% | 3.12% |
| 5/1-Year ARM | 2.86% | 3.00% |
| 30-Year Fixed Refi | 3.60% | 3.60% |
| 15-Year Fixed Refi | 2.98% | 2.95% |
| 5/1 ARM Refi | 2.94% | 2.86% |
| 30-Year Fixed Jumbo | 4.18% | 4.23% |

Rates may include points.

SOURCE: BANKRATE.COM



### READ

**1** Simon Cowell lashes out over "Voice," "X Factor" showdown
08 Sep 2012

**2** Job growth cools, posing challenge for Obama, Fed
5:54pm EDT

**3** Family feud one theory in French Alps murder probe
3:05pm EDT

**4** Chicago braces for first teacher strike in a generation
5:30pm EDT

**5** Did Obama's speech play fast and loose with the facts?
1:30pm EDT

### DISCUSSED

**84** Democrats attack Romney, defend Obama at convention

**81** Obama, Democrats to make their case as convention opens

**78** At Jackson Hole, a growing fear for Fed's independence

### SPONSORED LINKS


**Double Discount promotion**
Receive double interest rate discounts on select new auto refinances & purchases.


**Planning for Retirement?**
$500,000 portfolio? Download the guide by Forbes Columnist Ken Fisher's firm.


**WisdomTree AUD & NZD Fixed Income ETF**
AUD & NZD Fixed Income and Currency Appreciation Potential in an ETF. Learn more

A spokeswoman for LPS confirmed to Reuters that it had helped other firms establish operations that performed the same function. LPS spokeswoman Michelle Kersch didn't specify which firms. But beginning early in 2010, county recorders' records show, signing shifted also to law firms under contract with LPS.

Interviews with key players and court records also show that pending investigations and lawsuits pose a bigger threat to the company than Carbiener let on.

The criminal investigation in Jacksonville by federal prosecutors and the Federal Bureau of Investigation is intensifying. The same goes for a separate inquiry by the Florida attorney general's office. Individuals with direct knowledge of the federal inquiry said that prosecutors have impaneled a grand jury, begun calling witnesses and subpoenaed records from LPS.

The company confirmed to Reuters that it had hired Paul McNulty, former deputy U.S. attorney general in the George W. Bush administration, to represent it in the investigation. A spokeswoman for the U.S. Attorney's office declined to comment on the probe.

The U.S. Comptroller of the Currency's office, which is responsible for supervising national banks, also announced in November that it had teamed up with the Federal Reserve to conduct an on-site examination of LPS.

Meanwhile, the threats from four class action lawsuits filed in federal courts appear to be greater than the company has indicated, especially one filed in Mississippi. In a highly unusual move, a unit of the U.S. Justice Department has joined that suit as a plaintiff. The lawsuit alleges that LPS extracted many millions of dollars in kickbacks from law firms through an illegal fee-sharing arrangement, in exchange for doing out lucrative foreclosure work to them.

The lawsuit also charges that LPS illegally practices law and routinely misleads homeowners and federal bankruptcy judges. Carbiener has said there is little reason to worry about the Mississippi suit because the company already prevailed in a federal lawsuit in Texas that had made nearly identical accusations. But court records in that case show that the lawsuit was dropped without any ruling on the merits of the allegations.

Copies of LPS internal documents obtained by Reuters and testimony in lawsuits shed new light on the company's unusual dealings with its vast network of law firms. LPS relentlessly pressed them for speed. The result was almost instant filing of foreclosure documents, mostly prepared by clerical workers, not lawyers, according to court records, including deposition testimony by LPS officials. Several judicial opinions from around the country and evidence from investigations in Florida show that these documents often were riddled with inaccurate information about the amount homeowners owed, and were signed and notarized en masse without anyone at the firms checking the information in them.

Under LPS's system, law firms that were slower, often because their lawyers carefully prepared and reviewed court documents before filing them, were effectively punished, according to deposition testimony and other sources. The computer automatically assigned bad ratings to these firms, and the flow of work assignments to them dried up.

### A BOOMING BUSINESS

Few firms benefited more from the collapse of the U.S. housing boom than LPS. Spun off as an independent company in 2008, the company has seen its profits, with big help from its mortgage default services business, reach $232 million for the first nine months of 2010. That is a nearly 15 percent increase from the same period in 2009. Its revenue last year was $2.4 billion, up from $1.8 billion in 2008.

And business continues to surge. Carbiener told analysts on the October 29 call that "we continue to gain market share across all key business segments." In a November 23 report prepared for investors and clients, LPS said banks are pushing to foreclose on properties as rapidly as possible, driving "the foreclosure inventory ratio to all-time highs." It said that at the end of October, the number of properties going into foreclosure is "7.4 times historical averages and rising."

The banks' push to evict homeowners faster and in bigger numbers than ever before makes LPS's services even more crucial to them. LPS's success is built on its advanced, super-automated system that is highly efficient, low-cost, and speeds foreclosures through to completion. The "LPS Desktop" starts foreclosure actions, assigns work to law firms and supervises the cases to conclusion with almost no intervention by humans. (LPS says foreclosure actions are started by its

Ads by Marchex

clients, the loan servicers. But copies of agreements with servicers obtained by Reuters show that LPS has direct access to the banks' and other servicers' computer systems, and LPS detects defaults and initiates foreclosures based on parameters given to it by the banks.)

Few loan servicers could resist handing over key tasks to the company. Today, LPS boasts a client list that includes 14 of the 15 biggest loan servicers, with household names such as Wells Fargo and JPMorgan Chase -- its two biggest clients, according to LPS's most recent 10K filing with the Securities and Exchange Commission. The company has said that Bank of America joined as a client earlier this year. LPS says that all 50 of the nation's largest banks use at least some of its services.

In essence, LPS is a giant electronic butler for the big banks and other companies in the industry. It attends to routine tasks the loan servicers prefer not to do themselves. These include tracking mortgage payments, calculating amounts owed to investors who purchased bundles of mortgages, ensuring that property taxes and insurance get paid -- and automatically filing foreclosure actions when homeowners go into default.

The pending investigations and lawsuits, however, are focusing on whether LPS, in its zeal to serve its clients, broke the rules, in part by replacing missing bank documents with fictitious ones to make foreclosure cases go through.

SIGNATURE TROUBLE

The first sign of legal problems for LPS emerged earlier this year, when the company disclosed that federal prosecutors in Florida had opened a criminal investigation into apparently forged signatures on foreclosure documents prepared by DocX, the shuttered subsidiary located in a small office park in Alpharetta, Georgia.

Fidelity National Financial, LPS's former parent, had bought DocX in 2005. The unit soon became a high-speed mill, churning out mortgage assignments -- many of which are now known to be of doubtful validity -- on behalf of banks and investor trusts, helping them to foreclose on homeowners.

Mortgage assignments are documents transferring ownership, usually from the original lenders to trusts owned by investors who bought securitized packages of mortgages. Loan servicers typically file foreclosure actions on behalf of the trusts when any of their mortgages go into default. But cases popping up all over the country show that the original lenders never handed over ownership of mortgages to the trusts. Assignments establishing ownership of a mortgage are required as evidence in foreclosure cases.

DocX turned out tens of thousands of newly-minted mortgage assignments, purporting to show transfers of ownership long after the mortgages should have been handed over to the trusts, according to the standard provisions in trust agreements.

Thousands of these bore the signature of DocX employee Linda Green. The signatures didn't look alike, however, and LPS eventually confirmed that multiple DocX employees had signed her name. Some of the assignments stood out because they listed the new owner of the mortgages as "bogus assignee" or "bad bene."

LPS spokeswoman Michelle Kersch said "bogus assignee" and "bad bene" were simply standard placeholders on document templates which the employees inadvertently had neglected to fill in with the proper names.

In his October 29 conference call with analysts, Carbiener said that when the company discovered the DocX wrongdoing in December 2009, it immediately stopped it and soon shut DocX down. But it turns out that DocX continued operating much longer than LPS originally had acknowledged. In a written response last week to questions from Reuters, LPS's Kersch confirmed that DocX actually wasn't closed until August 2010. She said: "The last document signed by DocX was on May 14, 2010." But she said no improper signing had occurred there since 2009.

DUBIOUS DOCUMENTS

Hundreds of public records examined by Reuters show that production of suspect mortgage assignments was not limited to DocX.

The records indicate that employees in one of LPS's own offices, in Mendota Heights, Minnesota, signed and notarized large numbers of documents which for multiple reasons appear invalid.

Records filed with county recorders' offices show that the Minnesota office continued to turn out these documents at least through the end of January 2010.

Dozens of assignments were signed by LPS Minnesota office employees who listed themselves as corporate officers of banks and other loan servicers, a sampling of public records from counties in five states shows. As at DocX, the assignments were signed years after the mortgages should have been transferred to the investment trusts.

The signature of one of these LPS employees, Liquenda Allotey, appears on thousands of mortgage assignments. Homeowners' lawyers and at least one judge -- federal bankruptcy judge Joel B. Rosenthal in Massachusetts -- have noted that Allotey's signature is a simple zigzag line, raising questions about whether other individuals may have signed his name. Titles listed below the signature identify him variously as "vice president" or "attorney in fact" for at least 13 banks and mortgage companies.

LPS spokeswoman Kersch said Allotey signed all of the documents himself, and said all mortgage assignments prepared in the Minnesota office "were executed under a lawful grant of authority." She didn't spell out, however, how such authority was given.

In any event, two other aspects of many mortgage assignments signed by Minnesota employees raise strong doubts about the documents' legitimacy.

State laws, backed up by court decisions, require that mortgage investment trusts and others filing to foreclose on houses possess a valid mortgage assignment at the time they file for foreclosure. If it doesn't, the laws require that the case be dismissed.

An examination of county recorders' records turned up dozens of mortgage assignments signed and notarized by the Minnesota office weeks or months after a foreclosure case had been filed. Records show that even though invalid, the belated mortgage assignments often enabled foreclosure cases to sail through.

April Charney, an attorney who represents homeowners at Jacksonville Area Legal Aid, said in a Reuters interview that in most instances homeowners can't afford lawyers and don't challenge the foreclosures.

In many states, judges often approve the foreclosures without carefully examining the documents, she said. And at least until recently, when widespread questions were raised about the legitimacy of mortgage documents, judges routinely accepted belated mortgage assignments – even in cases contested by the homeowners, she said.

Equally difficult to explain are mortgage assignments signed by LPS Minnesota employees purporting to be officers of lenders that no longer existed. For example, in January 2010, two Minnesota employees jointly signed one as officers of Encore Credit Corp., defunct since 2008.

On other occasions, LPS employees signed as authorized officers of American Brokers Conduit, well after the subprime lender had been liquidated in bankruptcy. And in many instances they signed as officers of Sand Canyon Corp. In a March 18, 2009 affidavit, Sand Canyon's president, Dale M. Sugimoto, said the company had completely exited the mortgage business in 2008 and had no mortgages to assign.

In written answers to questions, LPS spokeswoman Kersch didn't respond directly to questions about the employees signing mortgage assignments after the foreclosures had been filed, or about signing on behalf of defunct companies. Instead, she said that the LPS employees signed mortgage assignments because lawyers who had filed foreclosure cases asked them to. She said the lawyers "decide when and if an assignment of mortgage is required."

Shortly after the federal investigation was launched in December 2009, LPS began moving to curtail document-signing activities at the company itself. LPS says that the Minnesota office stopped signing mortgage assignments at the end of January 2010, and public records appear to confirm that. Carbiener said during the analysts meeting that LPS has now ended all signing of mortgage assignments and affidavits at the company.

Without someone to draw up replacement documents, though, LPS's clients faced potential hardship, because so many mortgages were never assigned by lenders, as required, in the first place. Without these documents, thousands of foreclosures all over the country would come to a halt.

Reuters has learned that rather than stamping out the practice, LPS in December 2009 began transferring signing operations out of its own offices and into those of firms it has close relationships with. Kersch confirmed that LPS sent personnel to work "at client locations to assist clients during this period."

For example, LPS arranged through a local employment service to hire about a dozen notaries, sending them to work at a new signing operation set up in the Jacksonville office of American Home Mortgage Servicing, one of LPS's biggest clients.

Records from county recorders' offices show that at least as recently as October, American Home Mortgage Servicing employees signed exactly the same type of questionable mortgages assignments that LPS staffers at DocX and in Minnesota had signed. These included assignments done on behalf of defunct companies like American Brokers Conduit, and after foreclosure actions already had been filed. Reuters obtained a partial list of the names of the LPS-hired notaries. Copies of mortgage assignments available publicly show that these notaries notarized many of these assignments, including ones signed on behalf of defunct companies.

In interviews, two of the notaries, who asked that they not be identified, said the American Home Mortgage Servicing office also set up a "robosigning" operation for affidavits, another type of document required in foreclosure cases. The employees who signed the affidavits were swearing that they had verified the facts listed in them, such as the specific amounts owed by homeowners.

But the two notaries, who said they were dismissed after raising questions with supervisors about the practices, said that each morning about a half-dozen American Home Mortgage Servicing employees in about an hour would sign some 200 affidavits received via LPS's computer system, without reading them, let alone verifying the facts they contained. "In that time, come on, you have not verified figures in 200 documents. That's impossible," one of the notaries said.

Philippa Brown, spokeswoman for American Home Mortgage Servicing, said in an e-mailed statement that "We recently had independent audits conducted on our processes and it was found that at no time was AHMSI (American Home Mortgage Servicing Inc.) 'robosigning'." She confirmed that the company had used DocX until December 2009, and then "contracted with LPS" to provide it with notaries "in connection with execution of affidavits and other documents" in American Home Mortgage Servicing's office. Concerning assignments the company signed for defunct lenders, Brown said American Home Mortgage Servicing "obtains authorization from the previous parties," but did not explain how.

## LPS acknowledged that it had sent notaries to several companies to help them set up signing operations. Kersch said: "When LPS Default Solutions group transitioned away from signing

documents on behalf of its customers, in some cases it employed notaries who worked on-site at client locations to assist clients during this period." The spokeswoman confirmed that LPS provided training at these sites, but said it was only "technical" training on using the LPS Desktop system.

TROLLING FOR CASES

It remains unclear whether LPS faces more legal risks because of its document-signing operations or because of its odd arrangement with the lawyers assigned to file foreclosure actions.

Reuters has obtained new details of how the relationship worked from copies of the "network agreements" the law firms sign with LPS, among other sources. Interviews and records from court cases show that this system often worked to the detriment of homeowners struggling to keep their homes.

LPS says that clients are the ones who pick law firms to represent them in foreclosure cases. But copies of its agreements with clients reviewed by Reuters state that the company's clients sign up to use LPS's network of lawyer. The agreements and depositions from lawsuits show that when a homeowner goes into default, the LPS system automatically selects a law firm in its network, sometimes using criteria set by a client, and transmits an offer of work that pops up on the law firm's LPS Desktop screen.

The firm has no more than a couple of hours to accept the job. And if it does, it immediately agrees to pay an up-front fee to LPS. The law firms also pay LPS a monthly fee for use of the LPS Desktop system.

The company denies that it charges fees to lawyers in exchange for assignments of work. Kersch said the company charges fees strictly for the use of LPS's computer system. Carbiener on October

29 said: "Our services are nonlegal, and are similar to any other operational cost of a law firm such as the licensing costs they pay for word-processing software or accounting software."

But in a lawsuit deposition on January 13, 2010, Christian Hymer, an LPS first vice president, testified that the company often signs up the law firms that are part of its network. In addition, until recently, lawyers signed work agreements only with LPS, not with the loan servicers. Kersch said that currently lawyers are required to sign separate agreements both with LPS and the servicers.

Laws in nearly all states forbid lawyers to share legal fees with nonlawyers. The laws are intended to prevent kickbacks for funneling legal work to an attorney, the cost of which would be passed on to unsuspecting clients or, as in foreclosure cases, billed to homeowners.

LPS isn't a law firm. The Mississippi class action suit alleges that LPS is a nonlawyer middleman between the servicers (acting on behalf of trusts that own the mortgages) and the lawyers. It alleges that the company illegally decides which law firms get to file foreclosure cases, and makes decisions about what they file.

RED, YELLOW, GREEN

Interviews, deposition transcripts and LPS's own records underline that the company keeps its clients happy and maximizes its own fee income by whipping law firms to gallop cases through the courts.

The law firms are on a stopwatch: Kersch confirmed that the LPS Desktop system automatically times how long each firm takes to complete a task. It assigns firms that turn out work the fastest a "green" rating; slower ones "yellow" and "red" for those that take the longest.

Court records show that green ratings go to firms that jump on offered assignments from their LPS computer screens and almost instantly turn out ready-to-file court pleadings, often using teams of low-skilled clerical workers with little oversight from the lawyers. Copies of company newsletters from shortly before LPS was spun off show that the company each year gave awards to the law firms that were consistently the fastest.

Firms that move more slowly were slapped with "red" designations. For them, work offers dried up.

LPS denies that the rating system is used to punish slower firms. Kersch said the ratings are generated so that law firms can compare their speed and efficiency with an average calculated for a wide group of firms.

LEGAL AFFAIRS

The term "robosigners" was coined to describe the low-level clerical workers who signed many thousands of affidavits for foreclosure cases, swearing to the truth of facts they had never checked. But it turns out that the professionals at these firms -- the attorneys who have strict legal and ethical obligations to file truthful documents in court -- have carried out similar activities on a large scale. They allowed others to sign their names to multiple types of court pleadings they had never read or bothered to check, involving many types of documents.

In an April 2009 court decision, Diane Weiss Sigmund, a federal bankruptcy judge in Philadelphia, specifically faulted lawyers whose firm filed LPS-transmitted documents in court using clerical workers to sign the name of a lawyer who hadn't looked at them.

In that case, it turned out that, contrary to the documents supplied via the LPS system, the homeowners weren't in default on their mortgage.

Referring to the LPS computer system, the judge stated, "the flaws in this automated process become apparent." She added: "An attorney must cease processing files and act like a lawyer."

Jacksonville legal aid attorney Charney says that carelessly prepared documents, containing basic errors, have been used to foreclose on a big portion of the homeowners who have lost their houses.

LPS denies that its system encourages carelessness by law firms. In the October 29 conference call, Chief Executive Carblener said that based on routine internal reviews, "we are not aware of any defects in our signing and review processes that resulted in the wrongful foreclosure of any borrower."

(Editing by Jim Impoco and Claudia Parsons)

MONEY   HOUSING MARKET



# U.S. Trustee Alleges Systematic Fraud in Bankruptcy Courts

Posted on February 16, 2011 by Neil Garfield
Posted on February 15, 2011 (http://foreclosureblues.wordpress.com/2011/02/15/u-s-trustee-to-federal-judge-fidelity-operated-an-affidavit-execution-process-that-systematically-caused-the-execution-of-false-affidavits/) by Foreclosureblues (http://foreclosureblues.wordpress.com/author/foreclosureblues/)

## U.S. Trustee To Federal Judge: "Fidelity Operated An

## Affidavit-Execution Process

## That Systematically Caused The Execution Of False Affidavits!"

The **U.S. Trustee's Office** has recently filed a **_Post-Trial Brief (http://www.scribd.com/doc/48574477/UST-Post-Trial-Brief-on-LPS-Perjury)_** in ongoing bankruptcy litigation in a U.S. Bankruptcy Court in New Orleans, Louisiana in which it asks Judge Elizabeth W. Magner to hammer the alleged foreclosure document manufacturing racket management firm Lender Processing Services, Inc., f/k/a Fidelity National Information Services, Inc. ("Fidelity") with sanctions for allegedly:

- [p]ermitt[ing] its officer, Dory Goebel, to give materially misleading testimony to the Court on August 21, 2008, and should be sanctioned. It is undisputed that important parts of Goebel's testimony were untrue; the crux of the matter now is determining Fidelity's level of culpability. The evidence proves that, at a minimum, Fidelity acted with indifference to the truth in permitting Goebel to give the misleading testimony. (See **_U.S. Trustee's Post-Trial Brief In Lieu Of Closing Argument (http://www.scribd.com/doc/48574477/UST-Post-Trial-Brief-on-LPS-Perjury)_**, at page 1.)

REPORT   2/15/2011   17



In the following excerpt, U.S. Trustee describes to Judge Magner what it thinks of Fidelity (*bold text* is my emphasis) (*Post-trial brief (http://www.scribd.com/doc/48574477/UST-Post-Trial-Brief-on-LPS-Perjury)*, at p. 21-22):

- *Fidelity operated an affidavit-execution process that systematically caused the execution of false affidavits.* That Fidelity considered this a valuable service to its clients is made manifest in an article co-authored by Ms. Goebel appearing in Fidelity's corporate newsletter The Summit. In the article, published in September, 2006, Fidelity trumpeted the efficiency and benefits that its "document execution" process offered to servicer clients. Trial Ex. 17.The Fidelity affidavits were false because, per Fidelity's procedures, its affiant-employees: 1) did not sign in the presence of notaries; 2) did not take any steps to obtain personal knowledge of the averments contained in the affidavits; and 3) falsely represented the contrary, within the affidavits themselves, as to possession of requisite personal knowledge. Fidelity officers Scott Walter and Ms. Goebel testified in complete agreement that Ms. Goebel would not have executed her affidavit in the presence of a notary, and that Ms. Goebel would have obeyed Fidelity's procedures in that respect. December 1 Tr. 246:6-12, 337:5-22, 332:3-4.Mr. Walter and Ms. Goebel also testified in complete agreement that *Goebel would not have gained personal knowledge about the averments in her affidavit* and, again, that *Goebel's execution of the affidavit without gaining personal knowledge would have been in compliance with Fidelity's procedures* in that respect. December 1 Tr. 248:1-8, 342:21-343:3. Logically, thus, Fidelity expected its affiants to swear, falsely, that had gained that personal knowledge.

The U.S. Trustee's brief then goes on to give a damning example of this alleged misconduct.**(1)**

For more, see *In re Wilson – U.S. Trustee's Post-Trial Brief (http://www.scribd.com/doc/48574477/UST-Post-Trial-Brief-on-LPS-Perjury)* (filed February 1, 2011).

**(1)** In bankruptcy litigation unconnected to this case, the following excerpt from a December, 2010 *Reuters* story (see *Special report: Legal woes mount for a foreclosure kingpin (http://www.msnbc.msn.com/id/40533358/ns/business-us_business/)*) reports on Lender Processing Services (f/k/a Fidelity National Information Services) getting into a Pennsylvania bankruptcy judge's cross-hairs because of its business practices in connection with foreclosure actions:

- *In an April 2009 court decision (http://www.paeb.uscourts.gov/pages/pubopins/pdf/TAYLORPOSTSETTLEMEN_0715385_Opn.pdf)*, Diane Weiss Sigmund, a federal bankruptcy judge in Philadelphia, specifically faulted lawyers whose firm filed LPS-transmitted documents in court using clerical workers to sign the name of a lawyer who hadn't looked at them. In that case, it turned out that, contrary to the documents supplied via the LPS system, the homeowners weren't in default on their mortgage.Referring to the LPS computer system, the judge stated, *"the flaws in this automated process become apparent."* She added: *"An attorney must cease processing files and act like a lawyer."*

Judge Sigmund, in *In re Taylor (http://www.paeb.uscourts.gov/pages/pubopins/pdf/TAYLORPOSTSETTLEMEN_0715385_Opn.pdf)*, Case No. 07-15385-DWS (Bankr. E.D. Pa., April 15, 2009), had to deal with numerous document and communications screwups because of the business model used by LPS, and which led her to make the observation that the case before her was *"a textbook example of why the [LPS] procedures used by HSBC and its counsel in the name of minimizing collection costs is so problematic."*

Judge Sigmund concluded her 58-page opinion in her 2009 ruling with this parting shot at Lender Processing Services, Inc., f/k/a Fidelity National Information Services, Inc. and the foreclosure mill law firms they hop into bed with:

## PROOF OF SERVICE BY ELECTRONIC FILING
### and BY MAIL

I, RICHARD I. WIDEMAN, declare:

I am over the age of eighteen and not a party to the within entitled action and my business address is 3640 Sagunto Street #208, P.O. Box 1921, Santa Ynez, CA 93460-1921.

On November 9, 2012 I served a true and correct copy of:

**APPELLANT'S REPLY BRIEF**

on the parties in said action by USING THE Court's electronic filing system and by mail to

Daniel Solitro, Esq.
LOCKE LORD
300 So. Grand Avenue #2600
Los Angeles, CA 90071

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration is executed on November 9, 2012 at Santa Ynez, California.

s/ *RICHARD I. WIDEMAN*

**RICHARD I. WIDEMAN**